IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

**TAMMY RODICK,**                                           Case No. 1:16 CV 2723

    Plaintiff,                                           Judge John R. Adams

    v.                                           Magistrate Judge James R. Knepp, II

**COMMISSIONER OF SOCIAL SECURITY,**

    Defendant.                                           REPORT AND RECOMMENDATION

### INTRODUCTION

Plaintiff Tammy Rodick ("Plaintiff") filed a Complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision to deny disability insurance benefits ("DIB"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). This matter has been referred to the undersigned for preparation of a report and recommendation pursuant to Local Rule 72.2. (Non-document entry dated November 8, 2016). Following review, and for the reasons stated below, the undersigned recommends the decision of the Commissioner be reversed and remanded for further proceedings.

### PROCEDURAL BACKGROUND

Plaintiff filed for DIB in January 2012, alleging a disability onset date of December 1, 2009. (Tr. 148). Her claims were denied initially and upon reconsideration. (Tr. 78, 89). On June 17, 2013, after a hearing, an administrative law judge ("ALJ") issued a written decision denying Plaintiff's application. (Tr. 14-25). The Appeals Council denied Plaintiff's request for review (Tr. 1-6), and Plaintiff filed an action in this court, *see Rodick v. Comm'r*, Case No. 14cv2378 (N.D. Ohio). On April 9, 2015, upon joint motion of the parties, the court remanded the matter. (Tr. 845-

46); *Rodick v. Comm'r*, Case No. 14cv2378 (N.D. Ohio) (Doc. 16). On remand, Plaintiff (represented by counsel), and a vocational expert ("VE") testified at a second hearing before the same ALJ on August 9, 2016. (Tr. 677-705). On September 1, 2016, the ALJ again found Plaintiff not disabled in a written decision. (Tr. 642-51). Plaintiff then filed the instant action on November 8, 2016. (Doc. 1).

## FACTUAL BACKGROUND

*Personal Background & Testimony*

Plaintiff was born in January 1965, and was 44 years old on her alleged disability date. *See* Tr. 148. Plaintiff had a high school education (Tr. 36), and had previous work as a machinist and supervisor, waitress, bartender, housecleaner, and manager for a residential cleaning service (Tr. 37-41).

### *2013 Hearing*

At the time of the 2013 hearing, Plaintiff lived at home with her husband, and was able to drive. (Tr. 42). Plaintiff smoked previously, but quit three to four years prior to the hearing. (Tr. 44). Her husband smoked, but did so outside. *Id.*

Plaintiff testified she "attempt[ed] to try" house work, but her breathing interfered and it took her "a long time to do it." (Tr. 42). Her husband, son, and best friend helped with house work. *Id.* On a good day, Plaintiff "might be able to go to the grocery store, but that's kind of hard too because the walking part, the Prednisone has affected [her] legs and back" (Tr. 43); she might also be able to do laundry (Tr. 51). On a bad day, she cannot do anything. (Tr. 51). Plaintiff read, crocheted, and others would visit her; she went to church about twice per month. (Tr. 43-44). She testified she "might have two good days out of the week." *Id.* To the extent Plaintiff did household chores, she could only work five minutes at a time before needing a break. (Tr. 52).

Plaintiff had parked "a couple blocks" from the hearing, but "had to stop, start, stop, start". (Tr. 44-45). She testified she could walk about 500 feet before having to stop, and in response to the question, "So it took you 45 minutes to walk two blocks?", Plaintiff testified: "Pretty much". (Tr. 45).

Plaintiff testified she "started really having some issues in 2009" and her breathing difficulties had "just progressively . . . gotten worse through the years." (Tr. 45). She testified she "ha[d] to take breathing treatments like every four hours", and these took ten to fifteen minutes each time. (Tr. 46). Plaintiff testified it was hard for her to go out in public because many things trigger breathing problems. (Tr. 48).

Plaintiff testified prednisone made her feet swell and she could not wear shoes. (Tr. 46). Plaintiff took a base dose of prednisone, but had to increase it "depending on how bad the issue is with [her] asthma", and the more prednisone she took, the more water she retained. (Tr. 46-47). Plaintiff testified she gained 80 pounds the prior year due to the prednisone. (Tr. 47).

Plaintiff testified she "usually tr[ied] to keep [her legs] elevated at home" in a recliner, and that she elevated her legs about four hours in an eight-hour day. (Tr. 47-48).

Plaintiff testified she saw Dr. Khatri every three months for her breathing issues. (Tr. 48). She testified Dr. Khatri "doesn't want [her] lifting anything over five pounds and it seems like any time [she] bend[s] down it's like it just cuts my oxygen off to my lungs." (Tr. 50). Plaintiff testified in an average month she has ten to twelve severe asthma attacks that last up to an hour and "there's been times [she has] had to take four breathing treatments back to back." (Tr. 51).

Plaintiff also testified she was "usually up two or three times at night taking breathing treatments", and, as a result, needed a nap during the day. (Tr. 52).

*2016 Hearing*

At the August 2016 hearing, Plaintiff testified she had been taking prednisone continuously since her alleged onset date. (Tr. 681-82). Plaintiff testified she still had swelling in her feet and could not wear regular shoes. (Tr. 682). Plaintiff used oxygen every night, and sometimes during the day (approximately once per week). (Tr. 683-84). She used her breathing machine four to five times per day (an increase from the three to four times per day she testified at her previous hearing) for fifteen minutes at a time. (Tr. 684, 690). These treatments are as needed, not on a schedule. (Tr. 690).

Plaintiff testified she did laundry and cooked (taking breaks), but her daughter cleaned. (Tr. 684, 694). Plaintiff still drove, and went to doctor appointments or the grocery store. (Tr. 685). Plaintiff testified she does not, however, grocery shop alone, because she needs help picking things up. *Id.* Plaintiff testified she cannot bend down without becoming short of breath. *Id.*

Plaintiff stated she elevated her feet three to four hours per day. (Tr. 692-93). She did this an hour or so in the morning, a couple of hours in the afternoon, and again after dinner. (Tr. 696). She testified that she elevates her legs in a recliner, and that putting them on a footstool would not be sufficient to eliminate the throbbing in her legs and feet. (Tr. 695).

*Treatment Evidence*

In June 2009—prior to her alleged onset date—Plaintiff saw Dr. Mann Chuang ("Dr. M. Chuang"), an allergy specialist, for cough, chest tightness, shortness of breath, and wheezing. (Tr. 280). She reported the symptoms were perennial, with triggers including animal dander, tobacco smoke, weather changes, and cold air exposure. *Id.* Plaintiff reported she had quit smoking one month earlier, but her husband still smoked. *Id.* She had four emergency room visits the prior year (2008), and had missed 10 days of work "in the winter" due to symptoms. *Id.* Plaintiff also had

four courses of prednisone at that point in 2009. *Id.* On examination, Dr. M. Chuang noted "[d]iminished breathing sound[s]", "mild [shortness of breath] when talking", and "[d]iffuse expiratory wheezing and rhonchi with congestion." (Tr. 281). Spirometry testing showed "combined moderate obstructive a[nd] restrictive ventilator effect" with "[n]o significant improvement after bronchodilator". (Tr. 284) (capitalization altered).[1] Dr. M. Chuang assessed chronic obstructive asthma with exacerbation. (Tr. 281). She re-started Plaintiff on prednisone, told her to re-start Symbicort (2 puffs twice per day) after her cough improved, add Spiriva (one capsule inhalation once per day), and told her to continue albuterol nebulizer or Proventil HFA (2 puffs every 4-6 hours as needed). *Id.*

Records from later in 2009 showed Plaintiff's symptoms improved with prednisone treatment, and worsened when she went off it. (Tr. 265, 272-77). In early 2010, Dr. M. Chuang attempted to taper Plaintiff's prednisone dosage (Tr. 262), but Plaintiff reported increased symptoms on the lower dosage, so Dr. M. Chuang increased the dosage, with a plan to taper in the future (Tr. 259-60). In May 2010, Dr. M. Chuang noted Plaintiff had "continued to do well with her asthma" and her lungs were clear to auscultation and her breathing efforts were normal. (Tr. 250-51). In October 2010, Plaintiff was "not doing too bad" and her asthma was "stable" on a visit to internal medicine physician Wuu-Shung Chuang, M.D. ("Dr. W. Chuang"). (Tr. 439). Her medications during this time remained mostly the same, with Xolair injections added in 2009 and 2010. (Tr. 265, 262-63, 260, 251, 439-40).

In November 2010, at a follow-up visit with Dr. M. Chuang for asthma/COPD, Plaintiff reported she had "continued to do well with her asthma throughout the summer", until she

---

1. The spirometry testing showed an FVC of 2.47 liters (68% of predicted), and an FEV1 of 1.73 liters (59% of predicted). (Tr. 283).

developed some coughing and wheezing about 2 weeks prior. (Tr. 246). She reported her husband had smoked in the house occasionally when the weather got cold. *Id.* Dr. M. Chuang noted she was "[o]ver all [sic] improving gradually" and noted she would re-start prednisone if symptoms got worse. (Tr. 247). Spirometry testing results showed "mild obstructive ventilator defect with restriction" with "[n]o significant improvement after bronchodilator."[2] (Tr. 249).

In April 2011, Plaintiff reported to Dr. M. Chuang that she had been out of the area since January and was unable to receive her Xolair injections. (Tr. 243). She also reported an increase in nebulizer usage. *Id.* Examination showed normal breathing effort while resting, mild diffuse wheezing, and no prolonged expiration. (Tr. 244). Dr. M. Chuang assessed COPD, extrinsic asthma with exacerbation, and secondhand smoke exposure. *Id.* She continued Plaintiff's medications (Spiriva, Proventil HFA, Symbicort, Xolair), added prednisone with a taper schedule, and "[a]gain address[ed] the importance of a smoke-free environment." *Id.*

The following month, Plaintiff reported completing two tapered courses of prednisone with improvement, followed by return of symptoms several days later. (Tr. 237). Dr. M. Chuang continued Plaintiff's medications, and resumed prednisone with a plan to "taper slowly." (Tr. 238). Dr. M. Chuang also noted Plaintiff reported more symptoms in the summer and that she would "consider low dose Prednisone as maintenance dose in the summer." *Id.* In June 2011, Plaintiff reported "slow improvement" on prednisone, with more exertional shortness of breath. (Tr. 234). In August 2011, Plaintiff reported she had tapered off prednisone and had not had any exacerbation of symptoms. (Tr. 230-31).

---

2. The spirometry testing showed an FVC of 2.60 liters (72% of predicted), and an FEV1 of 1.3 liters (59% of predicted).

In October 2011, Plaintiff was hospitalized for three days with pneumonia. (Tr. 227). She improved with antibiotics (Tr. 227), and a follow-up x-ray showed "mild infiltrates in the lungs bilaterally". (Tr. 290-91).

In November 2011, Plaintiff reported tapering off prednisone two days prior and that she no longer had wheezing, but still had exertional shortness of breath. (Tr. 227). She also reported swelling in her feet after discontinuing prednisone, and was taking Lasix for the swelling. (Tr. 227-29). Dr. M. Chuang continued Plaintiff's other medications. (Tr. 228-29).

In January 2012, Plaintiff reported she "had been doing well" until one week prior when she developed nasal discharge, cough and wheezing. (Tr. 224). On examination, physician assistant Eric Betka found normal breathing effort while resting, lungs clear to auscultation, and "[d]efinite wheezing". *Id.* He diagnosed an exacerbation, and continued Plaintiff's medications, adding an antibiotic, and re-starting prednisone with a tapering plan. (Tr. 225).

In February 2012, Plaintiff saw Dr. W. Chuang who noted facial puffiness, and 2+ edema in Plaintiff's feet and legs. (Tr. 427). He also noted a prolonged expiratory phase and minimal wheezing on both sides. *Id.* He continued Plaintiff's asthma medications, and increased her Lasix dosage due to swelling. (Tr. 428). Plaintiff returned for follow-up in May 2012, reporting shortness of breath worse with exertion. (Tr. 425). Her face was still "rather puffy", but she had no edema in her legs or feet. *Id*; Tr. 426 ("Leg edema is all gone with incre[a]se of Lasix.").

In May 2012, Plaintiff saw pulmonologist Sumita Khatri, M.D., on referral from Dr. Chuang. (Tr. 390-96). Plaintiff reported she had been "progressively getting worse and now can't breathe." (Tr. 390). Plaintiff reported she previously worked in a car parts machine shop with fume exposure, and that she had taken her nebulizer to work "which would help." (Tr. 391). Plaintiff also reported she did not think her medications were helping. *Id.* On examination, Dr. Khatri found

distant breath sounds and occasional expiratory wheezing. *Id.* She also noted Plaintiff was "audibly breathing" and "seem[ed] winded with even conversation at rest." *Id.* Spirometry testing "indicate[d] severe obstructive ventilator defect". (Tr. 398). Dr. Khatri's impression of examination and testing was: "[d]yspnea multifactorial asthma as well as COPD with FEV1 of 47% and 11% BDR. Unclear to what extent each is contributing. Allergies also making symptomatic with allergic rhinosinusitis." (Tr. 392-93). Dr. Khatri diagnosed asthma, COPD, and allergies. (Tr. 392). She continued Plaintiff's medications (Symbicort – 2 puffs daily, Spiriva daily, prednisone daily, albuterol as needed, tessalon perles for cough), and recommended further lung testing. (Tr. 393). She also recommended pulmonary rehabilitation/exercise if it was available at the local hospital. *Id.*

Later in May 2012, Plaintiff saw internal medicine physician Georgia Newman, M.D., for swelling in her right foot "which started 3 weeks ago when she came close to tripping over her dog and her foot hit the wall." (Tr. 423). X-rays were negative, and Plaintiff was instructed to elevate her leg and limit walking. *Id.* Her current medications were continued. (Tr. 424).[3]

In September 2012, Plaintiff saw Shannon Goldsmith, D.O., to establish care. (Tr. 1199-1201). On examination, Dr. Goldsmith noted lower leg swelling, and decreased breath sounds and wheezes, but no respiratory distress. (Tr. 1200). Dr. Goldsmith diagnosed bronchitis, leg edema, and COPD. (Tr. 1201).

Also in September 2012, Plaintiff returned to Dr. Khatri. (Tr. 617). Plaintiff reported attending four sessions of pulmonary rehabilitation, but her "asthma instability prevented further

---

3. These included, among other things, Lasix (40 mg, once a day, as needed for edema), Profentil JFA (2 puffs, inhaled, 4 times per day as needed), Spiriva (inhaled, once a day), Xolair (subcutaneously every 4 weeks), SymbiCort inhaler (two puffs, inhaled, twice a day), prednisone (20 mg, twice per day), Qvar aerosol (inhaled, two times a day), and Ventolin HFA aeorosol (2 puffs, inhaled, 4 times a day). (Tr. 424).

progress." *Id.* She was walking five minutes on a treadmill daily at home, and using her nebulizer four to five times per day and through the night. *Id.* Dr. Khatri diagnosed severe persistent asthma, poorly controlled; shortness of breath; COPD; and asthma. (Tr. 619-20). She continued and adjusted Plaintiff's medications, which included albuterol, prednisone, Spiriva, Xolair, Dulera, and Singular. (Tr. 620-21). Dulera was substituted for Symbicort. (Tr. 621). Dr. Khatri also recommended Plaintiff return to pulmonary rehabilitation. (Tr. 619).

A chest CT performed at this time showed mild emphysematous changes of the lungs, opacities in the bilateral lung fields ("most likely infections/inflammatory in etiology"), and that previously noted opacities had resolved. (Tr. 630).

In October 2012, Plaintiff reported to Dr. Goldsmith her swelling was "greatly improved" with Lasix and she was able to get her shoes on. (Tr. 1202). She still had some shortness of breath, "but not worse than normal." *Id.* On examination, Dr. Goldsmith noted decreased breath sounds and a slight expiratory wheeze. (Tr. 1203).

In December 2012, Plaintiff returned to Dr. Khatri. (Tr. 624-26). She reported her shortness of breath was not better, and her symptoms were worse when laying down. (Tr. 624). She also reported prednisone helped her breathing, but caused cramping in her chest and back, as well as weight gain. (Tr. 625). She also requested a portable nebulizer machine. *Id.* Dr. Khatri noted Plaintiff's spirometry testing was "a bit better" with "FEV1 up from 47% to 51% with 3% BDR". (Tr. 626). Dr. Khatri noted Plaintiff had "[n]o active exacerbation but varying stability" in her asthma and COPD, and that she would arrange a new nebulizer and portable nebulizer. (Tr. 627). She also stressed the importance of a smoke-free and clean indoor environment. *Id.* Dr. Khatri continued Plaintiff's medications, including: prednisone, albuterol, Dulera, Lasix, and Xolair. (Tr.

627-28). She instructed Plaintiff to "continue the inhalers and prednisone as you are doing". (Tr. 628).

In April 2013, Plaintiff went to the emergency room, where she was diagnosed with chronic bronchitis and emphysema, and treated with antibiotics. (Tr. 632-33). She reported later to Dr. Khatri that she went to the ER via ambulance due to shortness of breath and turning blue, and had received five breathing treatments while there. (Tr. 1083). A CT scan in April 2013 showed mild emphysematous changes of the lungs. (Tr. 1093-94).

Also in April 2013, Plaintiff turned to Dr. Khatri for follow up. (Tr. 636-38; 1082-87). Plaintiff reported she was exercising at home, and doing home pulmonary rehabilitation. (Tr. 1083). She also reported leg swelling from steroids, but that it was better when the steroid dosage was lower. *Id.* Plaintiff also reported her husband had stopped smoking in the house. *Id.* Dr. Khatri noted she would "[c]ontinue current meds", listing: " (Dulera 2 puffs twice daily", "Spiriva daily", and "prednisone 10 mg daily". (Tr. 1084). She also told Plaintiff to re-join a pulmonary rehabilitation program. *Id.* Plaintiff was instructed to return in four months and have spirometry testing done prior. (Tr. 1085). Dr. Khatri also completed a physical evaluation form, discussed further below in the "Opinion Evidence" section. *See* Tr. 636.

In June 2013, Plaintiff returned to Dr. Goldsmith, noting Dr. Khatri recommended she do so because of water retention issues. (Tr. 1203). Specifically, Plaintiff reported fluctuating swelling in her legs, worse recently. (Tr. 1204). Plaintiff also reported chest tightness, cough, and shortness of breath occurring daily. *Id.* Dr. Goldsmith thought Plaintiff's swelling was likely due to prednisone, and encouraged her to keep her legs elevated. (Tr. 1205). At a cardiac follow-up appointment in July 2013, Osama Ibrahim, M.D., stated Plaintiff's symptoms were non-cardiac in nature and "most probably related to her asthma and pulm[onary] fibrosis." (Tr. 1208).

In August 2013, Plaintiff called to request medication refills (albuterol solution for nebulizer and prednisone) which Dr. Khatri authorized. (Tr. 1563-64). Plaintiff returned to Dr. Khatri in September 2013, reporting variable use of prednisone depending on the heat. (Tr. 1104). She reported the prednisone helped with her chest tightness, but it caused leg swelling and weight gain. *Id.* She reported trying to walk on her treadmill, but could only do so for five minutes. *Id.* She also had not been to pulmonary rehab due to a lack of transportation. *Id.* Plaintiff also reported she stopped taking Xolair one year earlier because it was not helping. (Tr. 1105). Dr. Khatri's impression was severe persistent asthma, poorly controlled, and steroid dependent. *Id.* Dr. Khatri adjusted Plaintiff's medications, adding a trial of a budesonide nebulizer on top of her current regimen, which included Dulera, Spiriva, Singulair and prednisone. (Tr. 1105-06). Dr. Khatri also noted Plaintiff could use prescription oxygen as needed, should do a home physical therapy/pulmonary rehabilitation-type regimen "if able", and suggested a sleep study. *Id.*

In January 2014, Plaintiff saw Dr. Goldsmith complaining of sinus congestion for one week, and requested medication refills. (Tr. 1209-12). On examination, Plaintiff had decreased breath sounds, but no wheezes or rhonchi. (Tr. 1211). Dr. Goldsmith noted "[m]oon faces from chronic steroid use." *Id.* Dr. Goldsmith assessed sinusitis, prescribed amoxil, and instructed Plaintiff to "[c]ontinue with daily inhalers and steroids". (Tr. 1212). Plaintiff returned to Dr. Goldsmith's office[4] in April 2014, complaining of congestion and shortness of breath for three days. (Tr. 1213-14). On examination, she had wheezes and rales. (Tr. 1213). Plaintiff was assessed with acute bronchitis with COPD and an upper respiratory infection. (Tr. 1214). She was instructed, among other things, to "[c]ontinue neb[ulizer] treatments [every] 4-6 hours". *Id.*

---

4. Plaintiff saw Tina Mitterling, PA. (Tr. 1213).

In April 2014, Plaintiff returned to Dr. Khatri. (Tr. 1088-91, 1100-02). Dr. Khatri noted Plaintiff was "[t]raveling to Smoky Mountains, Arkansas, and Missouri" and was "[s]taying in a cabin." (Tr. 1089). Plaintiff reported weaning herself off prednisone, taking a lower dose of Lasix, and riding a stationary bicycle for three minutes at a time. *Id.* On examination, Dr. Khatri noted Plaintiff had "distant but good" breath sounds bilaterally, with good air exchange, no wheezes or rhonchi. (Tr. 1090). Plaintiff also had no edema. *Id.* She noted Plaintiff had severe persistent asthma with poor control "but doing better now." *Id.* She also noted Plaintiff was on nocturnal oxygen, and discussed that the word burning stove in her home might be affecting her breathing. *Id.* She planned to contact a portable oxygen company and request a "portable oxygen concentrator and battery pack". *Id.* Finally, she noted Plaintiff should use Dulera (two puffs twice daily), Spiiriva (daily), budosenide (one nebulizer twice a day), and Flonase nasal spray. (Tr. 1090-91).

In October 2014, Plaintiff saw Dr. Goldsmith for medication refills, and to discuss changing her Diovan medication due to its cost. (Tr. 1214). Plaintiff reported exercising regularly; she had lost twenty pounds since her prior visit, and her swelling was "controlled". *Id.* Plaintiff also reported her breathing had been stable. *Id.* Dr. Goldsmith changed Plaintiff's prescription from Diovan to "hctz". (Tr. 1215).

*Opinion Evidence*

*Consultative Examinations*

In May 2012, Plaintiff underwent a consultative examination with Dr. Khalid Darr at the request of the state agency. (Tr. 401-16). Plaintiff reported being diagnosed with asthma at age two, and having smoked cigarettes for 15 to 20 years before quitting. (Tr. 401). She also reported shortness of breath and wheezing after walking eight to ten steps. *Id.* Plaintiff reported her current medications included Q-var, Lasix, Albuterol, Proventil, Spiriva, Diovan, Fluticasone, Symbirot,

and Tessalon. (Tr. 401-02). Dr. Darr observed Plaintiff had a normal gait and appeared "stable at station and comfortable in the supine and sitting positions." (Tr. 402). On examination, Plaintiff's lungs were clear to percussion and auscultation with symmetrical breath sounds and no chest tenderness. (Tr. 403). Plaintiff "was not noted to be short of breath with exertion or when lying flat during the exam". *Id.* Dr. Darr found Plaintiff had normal grip and muscle strength. (Tr. 403-04). Pulmonary function testing showed an FEV1 of 1.84 and an FCV of 2.51, indicating moderate COPD. (Tr. 412-16). Dr. Darr diagnosed COPD and opined Plaintiff could "sit, stand, carry and lift between 10 to 20 pounds frequently and over 25 pounds occasionally." (Tr. 404).

In December 2014, Dr. Darr performed a second consultative examination of Plaintiff. (Tr. 1217-24). Dr. Darr observed Plaintiff could "walk only about 50 feet before becoming short of breath", but had a normal gait, and appeared comfortable both sitting and laying down. (Tr. 1218). Plaintiff reported a hospitalization the prior year, and that she was "given a nebulizing treatment, which she uses on an ongoing basis." (Tr. 1219). Dr. Darr observed Plaintiff had expiratory wheezing and rales bilaterally, but "was not noted to be short of breath with exertion or when lying flat during the exam." *Id.* Plaintiff had no swelling in her extremities, and normal muscle strength. (Tr. 1219-20). Dr. Darr's impression was "Asthma/COPD" and in summary, he stated:

> The claimant's upper extremity functions for reaching, handling, fine and gross movements were intact. The claimant does not need any ambulatory aid. The claimant is able to push and pull objects and can also manipulate objects. The claimant can operate hand and foot control devices. The claimant is able to drive a motor vehicle and travel without any difficulty. The claimant is able to climb stairs, but with extreme degree of difficulty.
>
> Based on this clinical evaluation, the claimant is able to lift and carry between 15 to 20 pounds frequently and over 20 pounds occasionally. The claimant's activities of daily living and instrumental activities of daily living seem to be intact.

(Tr. 1220).

In July 2015, Plaintiff saw Dr. Goldsmith for follow up. (Tr. 1295-98). Plaintiff reported her prescription Lasix did not seem to be working as well as previously for her leg swelling, and reported worsening numbness in both lower legs. (Tr. 1296). On examination, Plaintiff had no respiratory distress or wheezes, but decreased breath sounds. (Tr. 1297). She had bilateral lower extremity edema and a sensory deficit below both knees. *Id.* Dr. Goldsmith assessed Type II diabetes, and ordered an EMG study of Plaintiff's legs. *Id.* The EMG, performed in September 2015, showed both lower extremities had mild swelling but the study was normal, "with no evidence of peripheral vascular disease." (Tr. 1354, 1363). Plaintiff "refused the exercise portion of the study secondary to shortness of breath." *Id.* An MRI of Plaintiff's lumbar spine (performed due to low back pain with numbness and tingling in legs) showed minimal degenerative changes, with mild bulging discs at L5-S1 and mild hypertrophy of facet joints at L3-4 and L5-S1. (Tr. 1356-57).

In November 2015, Plaintiff saw Sunjay Mathur, M.D., for back pain that had worsened over the past seven months. (Tr. 1386-87). Plaintiff had tried a home exercise program, stretching, and physical therapy with minimal relief. (Tr. 1387). Dr. Mathur assessed radiculopathy, lumbar region, gave Plaintiff a steroid injection, and prescribed medication. (Tr. 1390).

In May 2016, Plaintiff returned to Dr. Goldsmith. (Tr. 1269-71). On examination, Plaintiff had normal breath sounds, no wheezing, and no edema. (Tr. 1270).

*Reviewing Physicians*

In June 2012, Maureen Gallagher, D.O., reviewed Plaintiff's records and opined Plaintiff could perform light work, with environmental limitations due to COPD. (Tr. 74-75) (stating Plaintiff should avoid "concentrated exposure" to extreme temperatures and humidity, and avoid

14

"even moderate exposure" to fumes, odors, dusts, gases, and poor ventilation). Leigh Thomas, M.D., reviewed the evidence in August 2012 and reached the same conclusion. (Tr. 85-86).

*Treating Physician*

In April 2013, Dr. Khatri filled out a one-page form entitled "Physical Capacity Evaluation." (Tr. 636). In it, she listed Plaintiff's diagnosis as "severe persistent asthma, poorly controlled" with a primary symptom of "shortness of breath." *Id.* She opined Plaintiff could stand and walk for two hours, and sit for three hours, in an eight–hour workday. *Id.* She indicated Plaintiff would "often" require additional breaks during the workday due to shortness of breath and cough. *Id.* Finally, Dr. Khatri opined Plaintiff experiences approximately 21 bad days per month in which her symptoms increase and she would not be able to complete an eight-hour work shift. *Id.*

In April 2015, Dr. Khatri wrote a "to whom it may concern" letter on Plaintiff's behalf, stating:

> This letter is to affirm that Tammy Rodick has been my patient for several years. She has severe lung disease from COPD and asthma that has caused significant disability.
>
> Based upon her symptoms and requirement of daily steroids and frequent breathing treatments to breathe, it will be difficult if not impossible for her to maintain regular employment.

(Tr. 1233).

*Opinions from Friends*

Plaintiff submitted three letters from friends. George Ward stated Plaintiff is "always short of breath", "her feet are always swollen", and "she can't do much of anything without taking a break to breath[e]". (Tr. 982). Diann Sotille stated she had taken Plaintiff to the grocery store and has to get her a card so she can lean on it as they slowly walk into the store. (Tr. 984). Ms. Sotille

stated she goes to Plaintiff's house twice per week to help with the house work. (Tr. 985). Tia Cote stated she has observed Plaintiff has difficulty walking from her car to her house (approximately 200 feet). (Tr. 986). Ms. Cote also stated she helps Plaintiff around the house because "she can not lift heavy things" and "bending over makes her out of breath". *Id.*

*VE Testimony*

A VE testified at the August 2016 administrative hearing. (Tr. 698-705). When asked to consider an individual with the same age, education, and past relevant work as Plaintiff who could perform light work; climb ramps and stairs occasionally; never climb ladders, ropes, or scaffolds; occasionally kneel or crawl; who would have to avoid concentrated exposure to fumes, odors, dust gases, poor ventilation; and avoid concentrated exposure to hazards, the VE testified that such an individual would not be able to perform Plaintiff's past work. (Tr. 700). According to the VE, such an individual would, however, be able to perform jobs such as produce weigher, laborer marker, and small product assembler. (Tr. 700-01).

Plaintiff's attorney added a restriction with respect to pulmonary irritants "to require no exposure or maybe what we often call a clean air environment where there's little or no exposure to pulmonary irritants", and the VE testified that such an individual could still perform approximately 50 percent of the previously identified jobs. (Tr. 701-02).

The VE also testified that if the individual needed to elevate her legs at waist level or higher, or use oxygen in the workplace, it would require a special accommodation from an employer. (Tr. 702-03). The VE also testified that if a person was off task more than ten percent of the time, or missed more than one day of work per month, competitive work would be precluded. (Tr. 702). Finally, the VE testified that the need to elevate ones legs for a total of one hour per day

(during lunch and normal breaks) would not be a problem, "[b]ut if it's on the work floor, then I think there would be a problem." (Tr. 704).

*ALJ Decision*

In her September 7, 2016, decision, the ALJ determined Plaintiff last met the insured status requirements of the Social Security Act on December 31, 2014, and had not engaged in substantial gainful activity from her alleged onset date through her date last insured. (Tr. 645). She concluded Plaintiff had severe impairments of: "dysfunction of major joints; chronic obstructive pulmonary disease/asthma; . . . essential hypertension; and obesity". *Id.* She determined Plaintiff's impairments did not, either singly or in combination, meet or medically equal the severity of a listed impairment. *Id.* The ALJ concluded Plaintiff had the residual functional capacity:

> to perform light work as defined in 20 CFR 404.1567(b) except [she] must avoid concentrated exposure to extremes of heat and cold, must avoid concentrated exposure to humidity, and must avoid even moderate exposure to fumes, odors, dusts, poor ventilation, etc.

(Tr. 646). The ALJ then determined Plaintiff could not perform her past relevant work (Tr. 649), but considering her age, education, work experience, and RFC, there were other jobs she could perform, namely: produce weigher, label marker, and small products assembler. (Tr. 650-51). Therefore, she concluded, Plaintiff was not disabled from her alleged onset date (December 1, 2009), through her date last insured (December 31, 2014). (Tr. 651).

**STANDARD OF REVIEW**

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as

a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

<strong>STANDARD FOR DISABILITY</strong>

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. §§ 404.1520—to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

4. Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters,* 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and meets the duration requirements, is she determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

**DISCUSSION**

Plaintiff raises a single objection to the ALJ's decision: that the ALJ failed to properly evaluate the medical opinions, specifically the opinion of her treating physician. (Doc. 15, at 13-18). In particular, Plaintiff alleges the ALJ did not consider the required regulatory factors and did not mention an April 2013 function-by-function assessment from Dr. Khatri. *Id.* Within this argument, Plaintiff also challenges the RFC determination, decision to give more weight to non-treating sources, and failure to consider certain evidence. *Id.* The Commissioner responds that the ALJ's opinion is supported by substantial evidence, consistent with the law, and should be affirmed. (Doc. 17, at 15-25). Moreover, the Commissioner asserts that any failure to address Dr. Khatri's April 2013 opinion is harmless error. *Id.* at 18. For the reasons discussed below, the undersigned recommends the Court reverse the decision of the Commissioner and remand for the ALJ to clarify her consideration of Dr. Khatri's opinions.

*Treating Physician Rule*

Generally, the medical opinions of treating physicians are afforded greater deference than those of non-treating physicians. *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 242 (6th Cir. 2007);

19

*see also* SSR 96-2p, 1996 WL 374188. "Because treating physicians are 'the medical professionals most able to provide a detailed, longitudinal picture of [a plaintiff's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone,' their opinions are generally accorded more weight than those of non-treating physicians." *Rogers*, 486 F.3d at 242 (quoting 20 C.F.R. § 416.927(d)(2)).

A treating physician's opinion is given "controlling weight" if it is supported by: (1) medically acceptable clinical and laboratory diagnostic techniques; and (2) is not inconsistent with other substantial evidence in the case record. *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). The requirement to give controlling weight to a treating source is presumptive; if the ALJ decides not to do so, he must provide evidentiary support for such a finding. *Id.* at 546; *Gayheart v. Comm'r of Soc. Sec.,* 710 F.3d 365, 376-77 (6th Cir. 2013). When the physician's medical opinion is not granted controlling weight, the ALJ must give "good reasons" for the weight given to the opinion. *Rogers*, 486 F.3d at 242 (quoting 20 C.F.R. § 416.927(d)(2)). "Good reasons" are reasons "sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight." *Wilson,* 378 F.3d at 544.

When determining weight and articulating good reasons, the ALJ "must apply certain factors" to the opinion. *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 660 (6th Cir. 2009) (citing 20 C.F.R. § 404.1527(d)(2)). These factors include the length of treatment relationship, the frequency of examination, the nature and extent of the treatment relationship, the supportability of the opinion, the consistency of the opinion with the record as a whole, and the specialization of the treating source. *Id.* While an ALJ is required to delineate good reasons, he is not required to enter into an in-depth or "exhaustive factor-by-factor analysis" to satisfy the requirement. *See Francis v. Comm'r of Soc. Sec. Admin.*, 414 F. App'x 802, 804-05 (6th Cir. 2011); *Allen v. Comm'r*

*of Soc. Sec.*, 561 F.3d 646, 651 (6th Cir. 2009); *see also Nelson v. Comm'r of Soc. Sec.*, 195 F. App'x 462, 470 (6th Cir. 2006) (holding ALJ adequately addressed opinion by indirectly attacking both its consistency and supportability with other record evidence).

The ALJ here explained her consideration of Dr. Khatri's April 2015 opinion:

> The undersigned declines to accord controlling weight to the opinion of treating source Dr. Khatri dated April 29, 2015 [citing Tr. 1233]. Dr. Khatri opined that the claimant has a significant disability. This determination is reserved for the Commissioner. Dr. Khatri further opined that "it will be difficult if not impossible for her to maintain regular employment" due to daily steroids and frequent breathing treatments. Dr. Khatri's treatment notes do not reflect frequent daily breathing treatments prior to the date last insured. In fact, Dr. Khatri's notes would suggest that the claimant's asthma was well controlled on prednisone. For these reasons, the undersigned accords Dr. Khatri's opinion little weight.

(Tr. 649). The ALJ did not discuss Dr. Khatri's April 2013 opinion, which provided a function-by-function assessment of Plaintiff's limitations (Tr. 636).[5]

### *Dr. Khatri's April 2013 Opinion*

Plaintiff asserts—and the Commissioner acknowledges—that the ALJ does not reference Dr. Khatri's April 2013 opinion in her decision. The Commissioner asserts, however, that this is harmless error.

In her April 2013 opinion, Dr. Khatri stated Plaintiff had "severe persistent asthma, poorly controlled" with a primary symptom of "shortness of breath" and opined Plaintiff could stand and walk for two hours, and sit for three hours, in an eight–hour workday. (Tr. 636). She indicated Plaintiff would "often" require additional breaks during the work day due to shortness of breath and cough and experiences approximately 21 bad days per month in which her symptoms increase and she would not be able to complete an eight-hour work shift. *Id.*

---

5. The ALJ did address this opinion in her first decision. *See* Tr. 20. However, on remand, that decision was vacated, *see* Tr. 862, and the ALJ instructed to "issue a new decision" (Tr. 863).

An ALJ's failure to evaluate a treating physician's opinion may constitute harmless error (1) if "a treating source's opinion is so patently deficient that the Commissioner could not possibly credit it;" (2) "if the Commissioner adopts the opinion of the treating source or makes findings consistent with the opinion;" or (3) "where the Commissioner has met the goal of [Section 1527(c)]—the provision of the procedural safeguard of reasons—even though she has not complied with the terms of the regulation." *Nelson*, 195 F. App'x at 470 (citing *Wilson v. Comm'r,* 378 F.3d 541, 547 (6th Cir. 2004)).

Relying on the third such exception, the Commissioner asserts:

> Any deficiency in the ALJ's failure to discuss the specific limitations in Dr. Khatri's 2013 opinion is harmless error, as the record makes clear that the ALJ has complied with the goal of 20 C.F.R 1527(c) by analyzing the contradictory opinions of record and explaining the basis of the RFC finding. *See, e.g., Friend v. Comm'r of Soc. Sec.* 375 F. App'x 543, 551 (6th Cir. 2010). By according greater weight to the consultative examination findings and opinions of reviewing physicians, the ALJ made clear that he declined to adopt the limitations in Dr. Khatri's opinions, thus permitting adequate review of the ALJ's decision.

(Doc. 17, at 18). Although the undersigned agrees with the Commissioner that the ALJ "made clear that he declined to adopt the limitations in Dr. Khatri's opinions", the undersigned disagrees that this permits adequate review of the ALJ's decision. If an ALJ could, as the Commissioner suggests, "make clear" that she declined to adopt a treating physician's opined restrictions "[b]y according greater weight to the consultative examination findings and opinions of reviewing physicians", (Doc. 17, at 18), the exception would swallow the treating physician rule. This is particularly so where, as here, the ALJ completely failed to mention Dr. Khatri's April 2013 opinion, which included specific functional restrictions. *See Bledsoe v. Comm'r of Soc. Sec.,* 2010 WL 5795503, at *3 (S.D. Ohio) ("[W]hen an ALJ fails to mention relevant evidence in his or her decision, 'the reviewing court cannot tell if significant probative evidence was not credited or simply ignored.'") (quoting *Cotter v. Harris,* 642 F.2d 700, 705 (3d Cir. 1981)). The purpose of

the treating physician rule is two-fold. First, the explanation "'let[s] claimants understand the disposition of their cases,' particularly where a claimant knows that his physician has deemed him disabled and therefore 'might be bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied.'" *Wilson,* 378 F.3d at 544 *(*quoting *Snell v. Apfel,* 177 F.3d 128, 134 (2d Cir. 1999)). Second, requiring an explanation "ensures that the ALJ applies the treating physician rule and permits meaningful appellate review of the ALJ's application of the rule." *Id.* This purpose is not satisfied here, where the ALJ provided no mention of Dr. Khatri's April 2013 opinion, which contained specific functional restrictions.

The Commissioner essentially asks the Court to take the reasons provided by the ALJ for rejecting Dr. Khatri's April 2015 opinion, and apply them to Dr. Khatri's April 2013 opinion. *See* Doc. 17, at 17 ("Although the ALJ does not address the specific limitations in Dr. Khatri's one-page checklist opinion, the ALJ's statement that the opinion is not supported by the treatment notes is consistent with the evidence of record."). But this asks the undersigned to cross a bridge the ALJ did not build. The ALJ's statements were specifically directed at Dr. Khatri's April 2015 opinion (citing to it, quoting from it), and there is no indication in her opinion that she considered the 2013 opinion. *See Crowther v. Comm'r of Soc. Sec.*, 2012 WL 2711041, at *12 (S.D. Ohio) ("In fact, the ALJ's decision does not even acknowledge the April 2010 RFC questionnaires from . . . plaintiff's treating physicians. . . The ALJ's failure to address and discuss the treating physicians' RFC assessments requires remand to allow the ALJ to fully consider these records."). And these reasons do not address the functional restrictions regarding standing, walking, sitting, and required additional breaks to which Dr. Khatri opined in the April 2013 opinion.

Although the ALJ certainly discussed contrary record evidence, the ALJ's opinion does not "permit[ ] the claimant and a reviewing court a clear understanding of the reasons for the

weight given [the] treating physician's opinion" and thus "strict compliance with the rule" should not "be excused" here. *Friend,* 375 F. App'x at 551; *see also Cole,* 661 F.3d at 939 (Sixth Circuit "do[es] not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician's opinion and [it] will continue remanding when [it] encounter[s] opinions from ALJ's that do not comprehensively set forth the reasons for the weight assigned") (quoting *Hensley v. Astrue,* 573 F.3d 263, 267 (6th Cir. 2009)) (alteration in original) (internal quotation marks omitted). The ALJ's complete failure to address the existence of Dr. Khatri's April 2013 opinion cannot be excused simply because she cited, and relied upon, consultative and reviewing physicians' opinions to the contrary. The ALJ may well reach the same conclusion on remand, but in so doing, Plaintiff "will then be able to understand the Commissioner's rationale and the procedure through which the decision was reached." *Cole,* 661 F.3d at 940. The undersigned therefore recommends the Court remand this case to allow the ALJ to more fully explain her reasoning for the weight given to Dr. Khatri's April 2013 functional assessment opinion.[6]

---

6. In response to Plaintiff's arguments, the Commissioner also offers several post-hoc rationales for discounting the opinion: 1) "the one-page opinion is unsupported by any narrative explanation or reference to objective diagnostic test results and is inconsistent with other significant evidence of record" (Doc. 17, at 17); 2) "At the time he offered this opinion, Dr. Khatri had seen plaintiff on just three prior occasions . . ." (Doc. 17, at 17); 3) "Plaintiff's infrequent treatment with Dr. Khatri, with long intervals between treatment sessions, limits the value of his opinion as a treating source." (Doc. 17, at 18); 4) "Dr. Khatri consistently recommended that plaintiff participate in pulmonary rehabilitation and eliminate secondhand smoke in her home, recommendations that plaintiff consistently disregarded." (Doc. 17, at 19); and 5) "A pulmonologist may have unique insight regarding pulmonary function, but plaintiff offers no explanation of why a pulmonologist's opinion regarding limitations in lifting, walking, or sitting, would warrant particular deference, particularly given repeated examination findings that show no deficiencies in plaintiff's gait, muscular strength, or ability to ambulate." (Doc. 17, at 20). But these are not the reasons advanced by the ALJ, and are, rather, a post-hoc justification for the ALJ's conclusion. Adopting such an analysis would be improper post-hoc rationalization. *See Williams v. Comm'r of Soc. Sec.,* 227 F. App'x 463, 464 (6th Cir. 2007) (citing *SEC v. Chenery Corp.,* 332 U.S. 194, 196 (1947)) (a reviewing court, in assessing the decision of an administrative agency, must judge its propriety

*Dr. Khatri's April 2015 Opinion*

Dr. Khatri's April 2015 opinion consisted of a "to whom it may concern" letter stating:

This letter is to affirm that Tammy Rodick has been my patient for several years. She has severe lung disease from COPD and asthma that has caused significant disability.

Based upon her symptoms and requirement of daily steroids and frequent breathing treatments to breathe, it will be difficult if not impossible for her to maintain regular employment.

(Tr. 1233).

As noted above, the ALJ provided reasons for assigning this opinion "little weight". (Tr. 649). First, the ALJ did not err in discounting Dr. Khatri's April 2015 comments regarding Plaintiff's disability status. Medical opinions are statements from physicians regarding the severity of an individual's impairments and the most that individual can still do despite the impairments, including any potential restrictions. 20 C.F.R. § 404.1527(a). "A statement by a medical source that you are 'disabled' or 'unable to work' does not mean that [the Commissioner] will determine you are disabled." *Id.* § 404.1527(d). Rather, these opinions are issues reserved to the Commissioner and an ALJ is not required to give these opinions controlling weight or special significance. *Id.*; *see also Nejat v. Comm'r of Soc. Sec.*, 359 F. App'x 574, 578 (6th Cir. 2009) ("Although physicians opine on a claimant's residual functional capacity to work, ultimate responsibility for capacity-to-work determinations belongs to the Commissioner."). Because the disability determination is specifically reserved for the Commissioner, Dr. Khatri's statements

solely by the grounds invoked by the agency); *see also Jones v. Astrue*, 647 F.3d 350, 356 (D.C. Cir. 2011) ("The treating physician rule requires an explanation by the SSA, not the court.").

regarding Plaintiff's ability to work do not qualify as "medical opinions" and the ALJ was not required to give them controlling weight.

The parties dispute whether the ALJ's second reason for discounting Dr. Khatri's opinion—that Dr. Khatri's treatment notes "do not reflect frequent daily breathing treatments prior to the date last insured"—is supported by substantial evidence. Plaintiff contends it is not, pointing to records indicating Plaintiff was prescribed Albuterol by nebulizer to use three times daily as needed. (Doc. 15, at 17) (citing Tr. 226, 311, 318, 323, 352, 371, 380, 391, 394, 620, 625, 627, 1063, 1085, 1089, 1571, 1574, 1583, 1592, 1594). The Commissioner counters that "The ALJ was not unreasonable in finding that Dr. Khatri's records did not confirm that plaintiff was using a nebulizer for breathing treatments multiple times each day prior to her date last insured." (Doc. 17, at 22-23). The Commissioner contends that although Plaintiff may have been prescribed nebulizer treatments to use as needed, the record "does not support plaintiff's subjective representations that she required frequent treatments during the day, every day." (Doc. 17, at 23).

Plaintiff is correct that her medication list from her visits with Dr. Khatri repeatedly reflects Albuterol by nebulizer during the relevant time period. *See, e.g.*, Tr. 393, 620, 627, 1084, 1091, 1104 (listing all outpatient medications including: "albuterol 2.5.mg/3mL (0.083%) INHALATION nebulizer solution" with instructions to "Use via nebulizer three times daily as needed. OVER 5-15 MINUTES. FOR WHEEZING AND SHORTNESS OF BREATH."). Moreover, the records show that Dr. Khatri authorized/prescribed this prescription. *See* Tr. 1563-64 (Plaintiff's phone call requesting refills, including for the albuterol nebulizer solution, and listing "Authorizing Provider" as Dr. Khatri). It is unclear if the ALJ overlooked this prescription, or if, as the Commissioner contends, simply rejected the contention that Plaintiff needed these treatments frequently. This is a close call, however, because remand is proper to explain the ALJ's

consideration of Dr. Khatri's April 2013 opinion, "it would impose no additional burden on the ALJ to expressly address" and further discuss her reasons for the weight given to Dr. Khatri's April 2015 opinion on remand. *Gerhart v. Comm'r of Soc. Sec. Admin.*, 2012 WL 1068986, at *8 (N.D. Ohio).

*Other Arguments*

Because remand is required for the reasons stated above, it is unnecessary to reach Plaintiff's additional argument about whether the RFC determination is supported by the record. However, within the treating physician argument, Plaintiff raises several arguments about the ALJ's decision that the undersigned addresses here.

*Third-Party Reports*

First, Plaintiff's argument that the ALJ erred in failing to discuss the third-party reports of her friends is not well-taken. An ALJ is required to consider all the evidence in the record, but is not required to discuss every piece of evidence. 20 C.F.R. § 404.1545(a)(2); *see also Simons v. Barnhart*, 114 F. App'x 727, 733 (6th Cir. 2004) ("'Although required to develop the record fully and fairly, an ALJ is not required to discuss all the evidence submitted, and an ALJ's failure to cite specific evidence does not indicate that it was not considered.'") (quoting *Craig v. Apfel,* 212 F.3d 433, 436 (8th Cir. 2000)). The ALJ here represented that she considered all evidence of record. *See* Tr. 643-44, 648-49. Social Security Ruling 06-03p suggests, but does not require, that an ALJ's opinion include a discussion of third-party opinions. *See* SSR 06-03p, 2006 WL 2329939, at *6 ("Although there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision, the adjudicator *generally should* explain the weight given to opinions from these "other sources," or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent

reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case.") (emphasis added). Thus, there was no requirement that the ALJ explicitly reference these statements in her opinion. *See Laddy v. Astrue*, 2012 WL 776551, at *14 (N.D. Ohio), *report and recommendation adopted*, 2012 WL 777137 (N.D. Ohio) ("Plaintiff's contention that the ALJ violated the Social Security Rulings by failing to discuss and explain the weight she gave to the third-party reports lacks merit.").

Moreover, even if the ALJ erred by failing to reference these third-party statements, any such omission is harmless in light of Plaintiff's failure to demonstrate that express consideration thereof would have altered the ALJ's conclusion. The opinions given by Plaintiff's friends were similar in content to Plaintiff's testimony, which the ALJ considered in her opinion. *See Kidd v. Colvin*, 2014 WL 7238347, at *8 (N.D. Ohio) ("[E]ven if the ALJ's assessment of the third party opinions was erroneous, the error would be harmless, as Plaintiff has failed to identify how the outcome of his case would be different if the ALJ had assigned great weight to the third party statements."); *see also Cahill v. Comm'r of Soc. Sec.*, 2013 WL 331228, at *24 (N.D. Ohio), *report and recommendation adopted*, 2013 WL 331115 (N.D. Ohio) ("[T]he ALJ did not err by failing to discuss and explain the weight he assigned to third party reports, which largely echoed Plaintiff's own reports . . . .").

*Edema*

Second, Plaintiff contends the ALJ erred in her consideration of Plaintiff's edema—incorrectly attributing it to Plaintiff's hypertension, *see* Tr. 648, rather than her prednisone usage. Plaintiff is correct that the record suggests edema, or swelling, was a side effect of the prednisone she took for her breathing problems. *See, e.g.*, Tr. 625 ("Weight gain from pred again."), 1205 ("Agree with pt that swelling is more likely from prednisone but will check TSH today.").

However, regardless of its source, the ALJ addressed Plaintiff's claims of swelling and considered the effect it would have on her ability to work. *See* Tr. 648-49. Although the ALJ did not doubt that Plaintiff experienced edema, she explained that treatment records showed Plaintiff's "edema prior to her date last insured was generally controlled with Lasix" and "[t]here is no indication that the claimant complained of an inability to put on shoes, and by all accounts, the claimant was able to ambulate without any restrictions." (Tr. 649). This reasoning is supported by substantial evidence. *See* Tr. 423 (October 2012 – swelling "greatly improved" with Lasix and Plaintiff was able to wear shoes); 403 (May 2012 – no swelling); 425-26 (May 2012 – "no edema in legs and feet"; "Leg edema is all gone with increase of Lasix"); 1090 (April 2014 – "no . . .edema"); 1214-15 (October 2014 – "Swelling has been controlled"; "She exhibits no edema."); 1219 (December 2014 – no swelling); 1270 (May 2016 – "She exhibits no edema"). The only reference in the record to Plaintiff being unable to wear shoes was due to swelling in May 2012 a discrete injury. (Tr. 423). The ALJ's consideration of Plaintiff's edema was therefore supported by substantial evidence, even if she misstated the cause of the edema.[7]

### Duty to Develop the Record

Third, Plaintiff suggests the ALJ should have further developed the record. (Doc. 18, at 18) ("For instance, she could have arranged for review of the record and testimony by a medical expert; she could have returned the entire case file (with the updated evidence) to have the State Agency have a non-examining consultant review the updated record; or, she could have re-contacted Plaintiff's treating sources to seek additional information."). Although an ALJ has a duty to

---

7. This is so even though Plaintiff points to contrary evidence in the record. *See Jones,* 336 F.3d at 477 (even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn "so long as substantial evidence also supports the conclusion reached by the ALJ.").

develop the record, *Lashley v. Sec'y of Health & Human Servs.*, 708 F.2d 1048, 1051-52 (6th Cir. 1983), that duty is balanced with the fact that "[t]he burden of providing a complete record, defined as evidence complete and detailed enough to enable the [Commissioner] to make a disability determination, rests with the claimant", *Landsaw v. Sec'y of Health & Human Servs.*, 803 F.2d 211, 214 (6th Cir. 1986) (citing 20 C.F.R. §§ 416.912, 416.913(d)); *see also Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999) (explaining claimant's burden to prove disability). The determination of whether the ALJ has satisfied the duty to develop the record is not a bright line rule, but one that must instead be made on a case-by-case basis. *Lashley*, 708 F.3d at 1052; *Cox v. Comm'r of Soc. Sec.*, 615 F. App'x 254, 262 (6th Cir. 2015). This is not a case "[w]here there are obvious gaps in the record". *Kendall v. Astrue*, 2011 WL 4388794, at *5 (E.D. Ky.).

An ALJ is only obligated to obtain additional evidence if the evidence before her is insufficient to make a determination. *See* 20 C.F.R. § 404.1520b. Similarly, an ALJ has discretion in determining whether to call a medical expert. *Simpson v. Comm'r*, 2344 F. App'x 181, 189 (6th Cir. 2009) (noting the regulations "provide discretion rather than a mandate to the ALJ to decide whether to solicit medical expert testimony"); *see also Foster v. Halter*, 279 F.3d 348, 355 (6th Cir. 2001) ("An ALJ has discretion to determine whether further evidence, such as additional testing, or expert testimony, is necessary."). And, with regard to the duty to recontact a treating physician, the Sixth Circuit has held there are "two conditions that must both be met to trigger the duty to recontact: 'the evidence does not support a treating source's opinion . . . and the adjudicator cannot ascertain the basis of the opinion from the record.'" *Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 273 (6th Cir. 2010) (quoting SSR 96-5p, 1996 WL 374183, at *6). An unsupported opinion alone does not trigger the duty to re-contact. *Id.* And an ALJ only has a duty to recontact a treating physician when "the evidence does not support a treating source's opinion . . . and the

adjudicator cannot ascertain the basis of the opinion from the record. The medical record in this matter is voluminous, and the ALJ based her decision on this evidence. "[G]iven the breadth and depth of the evidence in the record, and this Court's deference to the ALJ in deciding whether the record is fully developed", *Simpson v. Comm'r*, 344 F. App'x 181, 189 (6th Cir. 2009), the undersigned finds the ALJ did not err in failing to further develop the record.

## CONCLUSION

Following review of the arguments presented, the record, and the applicable law, the undersigned recommends the Court find the Commissioner's decision denying DIB not supported by substantial evidence and recommends the decision be reversed and remanded under Sentence Four of 42 U.S.C. § 405(g).

s/James R. Knepp II
United States Magistrate Judge

*ANY OBJECTIONS* to this Report and Recommendation must be filed with the Clerk of Court within fourteen days of service of this notice. Failure to file objections within the specified time WAIVES the right to appeal the Magistrate Judge's recommendation. *See United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).